UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ALEXANDER VALENTINO ROMAN RAMSEY,

                          Plaintiff               DECISION AND ORDER

-vs-

                                           1:18-CV-00210 CJS

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
_____

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner" or "Defendant"), denying the application of Alexander Ramsey ("Plaintiff") for Supplemental Security Income ("SSI") Benefits.   Plaintiff claims to be completely disabled, primarily due to Asperger Syndrome.   Now before the Court is Plaintiff's motion for judgment on the pleadings (Docket No. [#9]) and Defendant's cross-motion [#12] for the same relief. For the reasons discussed below, Plaintiff's application is denied, and Defendant's application is granted.

FACTUAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action, which are fully set forth in the parties' submissions.   The Court will briefly summarize the record as necessary for purposes of this Decision and Order.

On May 12, 2002, when Plaintiff was seven years of age, his parents took him to be examined by psychiatrist Christopher G. Martin, M.D. ("Martin").   During the initial

visit, Plaintiff's parents related that he had "a lengthy history of oppositional defiant type symptoms,"[1] and that two years earlier, another doctor had diagnosed him with Attention Deficit Disorder ("ADD") and prescribed Adderal. The parents indicated that Adderall had initially been quite helpful, but that more recently, Plaintiff had been off task and impulsive at school, and seemed depressed. Martin conducted a psychiatric evaluation, and while his findings were essentially normal, he diagnosed "Attention Deficit Disorder – combined type." Martin discontinued Adderall, and prescribed Metadate CD.[2]

Martin would remain as Plaintiff's treating psychiatrist for approximately the next thirteen years. During subsequent office visits throughout that period that he continued to treat Plaintiff, Martin typically noted that Plaintiff was "doing ok," with unremarkable mental status examinations, and he typically reported that Plaintiff had Global Assessment of Functioning ("GAF") scores around 65,[3] indicating only mild symptoms.[4]

For example, on April 24, 2004, Martin reported that Plaintiff was "doing well in school" and "behaving well at school."[5] On December 20, 2005, Martin reported that Plaintiff was feeling overwhelmed at school, and that Plaintiff's mother felt he was doing "horrible" lately.[6] Approximately eight months after that, on August 3, 2006, Martin reported that Plaintiff was doing better on a new medication (Daytrana), with better

---

[1] Transcript at 291.
[2] Transcript at 291-292.
[3] See, e.g., Transcript at 290.
[4] See, Petrie v. Astrue, 412 F. App'x 401, 406 (2d Cir. 2011) ("Petrie's Global Assessment of Functioning Score ("GAF") was assessed at 65, indicating mild symptoms but generally good functioning.").
[5] Transcript at 289.
[6] Transcript at 280.

control of anger and less forgetfulness in daily activities.[7]   On November 9, 2006,

Martin reported that Plaintiff was "doing ok" and being homeschooled.   Plaintiff related

that he was less distracted, less fidgety, and less forgetful in daily activities.[8]   On April

18, 2007, Plaintiff told Martin that he was "ok," free of anxiety, and looking forward to

attending a boarding school in Florida, beginning in the summer.[9]   On August 13, 2007,

Plaintiff's mother told Martin that Plaintiff was "having some problems with focusing,"

although the same office note indicates that Plaintiff reported being less distracted, less

fidgety and less forgetful in daily activities.[10]  On January 4, 2008, Martin reported that

Plaintiff was "having problems with peers at school," but was otherwise "doing well with

school."[11]   Plaintiff's mother indicated that his behavior was much improved on his

current medications, Prozac and Concerta.   On August 8, 2008, Martin reported that

Plaintiff was having "less symptoms of ADHD," and was planning to attend boarding

school in Florida.   Martin reported that Plaintiff was "doing well," with improved ability to

concentrate and pay attention.[12]   Martin noted that his diagnosis was "ADHD

Combined Type, Pervasive Developmental Disorder Current NEC ("Not Elsewhere

Classifiable"), and he assigned a GAF score of 64.[13]

---

[7] Transcript at 274.
[8] Transcript at 270.
[9] Transcript at 266.
[10] Transcript at 262.
[11] Transcript at 258.
[12] Transcript at 254.
[13] See, https://www.aapc.com/blog/26237-icd-9-cm-nos-vs-nec/

The following summer, on July 17, 2009, Dr. Martin reported that Plaintiff had attended boarding school in Florida during the academic year, but had "not enjoy[ed the] experience," and was "not doing well."[14] Plaintiff indicated that he had some urges to injure himself, but denied actually engaging in such behavior. Plaintiff's mother stated that his behavior seemed to have been worse during the school year, "possibly related to being on his own" while away at school.[15] However, Martin's examination was unremarkable, and he again assessed a GAF score of 65. On August 25, 2009, Plaintiff's mother told Martin that Plaintiff's mood was stable, but that he "still need[ed] a lot of support to keep up on issues related to hygiene."[16] Plaintiff's mother opined that Plaintiff's mood improved when he did not have to "interact with other kids."[17] On October 27, 2009, Martin reported that Plaintiff had a stable mood, was involved with his church's youth group, was getting along with his family members, and was getting his schoolwork done with prompting.[18] Plaintiff's mother indicated that she had an appointment to have Plaintiff evaluated for Asperger syndrome. Martin noted that Plaintiff had a normal mood and affect, as well as intact judgment and insight. Martin's diagnosis was "Pervasive Developmental Disorder Current NEC, ADHD Combined Type," and he assigned Plaintiff a GAF score of 65.[19]

---

[14] Transcript at 248.
[15] Transcript at 248.
[16] Transcript at 246.
[17] Transcript at 246.
[18] Transcript at 244.
[19] Transcript at 244.

In late December 2009 and early January 2010, clinical psychologist Caroline Magyar, Ph.D.[20] ("Magyar") evaluated Plaintiff for Asperger Syndrome. At that time, Plaintiff was fifteen years of age. The evaluation took place over three days, although Magyar's report indicates that her assessment was based primarily on information provided by Plaintiff's parents. Magyar's diagnosis was Autism Spectrum Disorder, Generalized Anxiety Disorder, Depressive Disorder-NOS, and Chronic Motor Tic Disorder.[21] Generally, Magyar noted that Plaintiff had "a wide range of emotional and behavioral difficulties," including "global deficits in personal self-sufficiency skills" and "significant social communication deficits," resulting in "significantly below age expected performance in social, communication and daily living skills."[22] Indeed, Magyar's test results showed that Plaintiff had severe deficits in adaptive functioning. In particular, the results on the Vineland Adaptive Behavior Scale II showed that Plaintiff was in only the first percentile for daily living skills, that he was below the first percentile for socialization, and that he was in the fourth percentile for communication.[23] Similarly, the results of the Child Behavior Checklist testing showed that Plaintiff was above the 98th percentile for *problems*, including anxiousness, depression, somatic complaints, thought problems and attention problems.[24] Magyar concluded that Plaintiff's "neurocognitive deficits c[ould] significantly affect his ability to meet the academic

---

[20] Although it does not appear from the record, the Court is aware that Dr. Magyar is a recognized specialist in Autism Spectrum Disorder and is a faculty member of the University or Rochester School of Medicine.
[21] Transcript at 332.
[22] Transcript at 330-332.
[23] Transcript at 332.
[24] Transcript at 332.

demands (i.e., level of difficulty, pace of instruction, inferential thinking, and problem solving) associated with the secondary [school] setting."[25]   Among other things, Magyar recommended that Plaintiff continue treatment with Dr. Martin.

Shortly after Magyar's evaluation, on January 27, 2010, Plaintiff returned to Dr. Martin's office for routine follow up.   Plaintiff's mother informed Dr. Martin that Magyar had diagnosed Plaintiff with Asperger disorder.[26]   However, this information does not seem to have elicited any reaction or change in treatment from Martin.   Presumably, this was because Martin had already diagnosed Plaintiff with Pervasive Developmental Disorder, which is quite similar to Asperger's.[27]   In any event, Plaintiff reported that his mood was normal, that his medications seemed to be working, that he was getting along with his sibling and was "generally stable."[28]   Martin noted that Plaintiff's mood and affect were normal, that his judgment and insight were intact, and that his GAF score was 65.

On July 11, 2011, Martin reported that Plaintiff had spent the recent school year in Florida, and that Plaintiff's family was in the process of moving to Florida.[29]   Martin reported that Plaintiff would be beginning his senior year of high school, and would take his classes online.   Plaintiff's mother indicated that he was "doing well with focus and concentration," "making progress with his schoolwork," and "seeming to be more mature

---

[25]  Transcript at 334.
[26]  Transcript at 242.
[27]  *See*, website of Autism Society of Southeastern Wisconsin, https://assew.org/asperger-syndrome-pdd-nos/ ("The Diagnostic and Statistical Manual version 5 (DSM-5) has changed the way practitioners diagnose. Asperger Syndrome and PDD-NOS are no longer separate diagnosis. Going forward, everyone who meets criteria for autism will be given one of 3 severity levels. If you already have a diagnosis of PDD-NOS or Asperger Syndrome, there is no need to change your diagnosis to anything else.").
[28]  Transcript at 242.
[29]  Transcript at 234.

in his dealings with family." On December 27, 2011, Martin reported that Plaintiff was taking high school classes, and was expressing "some frustration over his classes and misperceptions of expectations by teachers."[30] Plaintiff related that his mood and concentration were both good, and that he was taking a lower dosage of Seroquel.[31] On December 28, 2012, Plaintiff reportedly told Dr. Martin that he had been living in Florida, and was doing "ok."[32] Plaintiff stated that his mood and concentration were both "ok," and that he was "planning on going to college in Feb[ruary]."[33] Martin's diagnosis was "ADHD Combined Type," and he assigned a GAF score of 65.[34]

Plaintiff's last documented visit to Dr. Martin was on June 28, 2013. At that time, Plaintiff reportedly told Martin that he wanted to eventually attend college in Florida, for architectural engineering.[35] Plaintiff stated that his mood was good, and that he was "doing well with his concentration."[36] Martin listed his diagnosis as "ADHD Combined Type, Pervasive Developmental Disorder Current NEC," and assigned a GAF score of 65. Plaintiff subsequently stopped treatment with Martin, because he and his parents felt that Plaintiff was quite stable on his current medications and did not require further therapy.[37]

On October 9, 2013, Plaintiff filed an application for SSI benefits, claiming that he became totally disabled on October 1, 2012. At the time of the application, Plaintiff was

---

[30] Transcript at 232.
[31] Transcript at 232.
[32] Transcript at 230.
[33] Transcript at 230.
[34] Transcript at 231.
[35] Transcript at 228.
[36] Transcript at 228.
[37] Transcript at 355, 382.

nineteen years of age, had never held a job, and was continuing to reside at home with his parents and a younger sibling. Plaintiff was taking high school classes online. In support of the application, on November 16, 2013, Plaintiff's mother, Dawn Ramsey, completed a Function Report.[38]  Mrs. Ramsey asserted that Plaintiff needs to be told when to shower, and to have someone check to make sure that he has actually washed himself; that he needs to be told when to shave; that he needs to be told when to eat; that he has "very messy toilet habits" and needs to be reminded to wipe himself; that he needs to be reminded to take his medication; that he needs supervision getting dressed so that he looks "minimally presentable"; that as far as cooking, he is limited to making sandwiches and oatmeal; that his meals are usually prepared by his parents; that he is able to do some chores around the house, such as taking out the trash and emptying the dishwasher; that he is unaware of his surroundings and could not find his way back home without assistance; that he cannot drive; that he does not shop; that he is unable to count out change correctly; that he has a hard time making and keeping friends; that he cannot focus for very long, especially during conversations; that he can finish short tasks, and can finish longer tasks provided that he is able to take breaks and that the tasks do not involve too many steps; that he gets easily frustrated and does not handle stress well; that he becomes upset if his schedule changes; that he has "trouble with responsibilities such as school, self help and daily chores"; and that he could not hold down a job that involved interacting with people.[39]

---

[38]  Transcript at 200-208.  The record does not indicate that Plaintiff's alleged disabilities would have prevented him from filling out the form himself.
[39]  Transcript at 200-208.

On November 6, 2015, while his SSI application was pending, Plaintiff established a new primary-care treatment relationship with family practitioner Jennifer Wisnoski, M.D. ("Wisnoski"). Wisnoski noted that Plaintiff's parents accompanied him to the appointment and provided most of the information. Plaintiff's parents reportedly told Wisnoski that he had been diagnosed with ADHD at age five, for which he was treated with medication and behavioral modifications; that school counselors felt that he might have some additional problems, which led to him being evaluated for, and diagnosed with, Asperger Syndrome, in ninth grade; that he was currently "very stable" taking Concerta and Zoloft; and that he was finishing his high school degree online.[40] Upon examination, Wisnoski observed that Plaintiff had some "mild tics," but no abnormal psychiatric symptoms.[41] Wisnoski reported that Plaintiff had "fair eye contact" and "normal mood and affect." As for treatment, Wisnoski noted that Plaintiff and his parents felt that his Asperger's symptoms were "very well controlled on current med[ications]," consisting of methylphenidate, and Zoloft, and that they wanted to "continue same."[42] Wisnoski's only recommendation was that Plaintiff "look into autistic services and local youth groups to encourage socialization."[43] Wisnoski noted that she spent about one hour with Plaintiff.

On February 18, 2016, Plaintiff's father, Todd Ramsey, submitted a "character statement" in support of the SSI application. The statement is seven and a half pages

---

[40] Transcript at 355.
[41] Transcript at 356-357.
[42] Transcript at 357.
[43] Transcript at 357.

long and single-spaced.[44]  Regarding Plaintiff's "hygiene and health," Mr. Ramsey essentially indicated that Plaintiff is incapable of showering, shaving or toileting without parental supervision.   For example, Mr. Ramsey stated that he or his wife needs to stand behind Plaintiff each day and observe that he flosses his teeth.   He stated that at times he and Mrs. Ramsey intentionally fail to remind Plaintiff to attend to his hygiene, to see whether he will remember to care for himself, but that he fails to do so on his own.   He further stated that to ensure that Plaintiff has regular bowel movements, he and Mrs. Ramsey make Plaintiff sit on the toilet at specific times, otherwise he will not remember to use the toilet.   Mr. Ramsey stated that Plaintiff must be reminded to eat or otherwise he forgets.   With regard to family social interaction, Mr. Ramsey indicated that Plaintiff prefers to be alone, and must be cajoled into spending time with other people.   He stated that Plaintiff generally cannot spend more than three hours with family.   Additionally, Mr. Ramsey indicated that Plaintiff has difficulty interacting with groups of people, due to his inability to read social cues and his tendency to focus solely on his own thoughts.   He stated that these problems caused many problems for Plaintiff at school, which is why the decision was made to have him homeschooled. Moreover, Mr. Ramsey stated that Plaintiff is easily distracted, and that he must use an online education system that allows the parents to monitor his progress and to provide reminders.   In that regard, he stated that without reminders, Plaintiff will not complete his assignments.   Mr. Ramsey also stated that Plaintiff has great difficulty communicating with others and difficulty learning new behaviors.   Mr. Ramsey stated

---

[44]  Transcript at 213-220.

that Plaintiff is particularly sensitive to certain noises, and is unable to recognize his surroundings when he leaves home.

On March 17, 2016, the Commissioner had Plaintiff consultatively examined by psychologist Janine Ippolito, Psy.D. ("Ippolito"). Ippolito performed an intelligence evaluation and a psychiatric evaluation, and also completed a statement concerning Plaintiff's ability to perform work-related activities.[45] Ippolito noted that Plaintiff was a twenty-one-year-old man who was accompanied by his father. Ippolito noted that Plaintiff's hygiene was fair, his eye contact was poor, and he was initially tense and anxious, but that he became more relaxed as the examination proceeded. Ippolito noted that Plaintiff "did not evidence significant emotional distress during the evaluation."[46] Plaintiff told Ippolito that he had stopped treating with Dr. Martin about eighteen months earlier, and Ippolito noted that according to Plaintiff's records, he was "stable on his current medication regimen and [was] not in need of seeing a therapist."[47] Plaintiff denied having current problems with depression or panic attacks, but claimed that he had "some short term memory deficits and concentration difficulties."[48]

Plaintiff told Ippolito that he is "able to do basic cooking and showering and dressing independently," and that he "helps with cleaning around the home." Plaintiff stated that his parents otherwise take care of household chores, and provide him with transportation, since he does not drive. Plaintiff stated that he has friends with whom he communicates online, and that he keeps in touch with members of his extended

---

[45] Transcript at 362-364, 370-374, 382-386.
[46] Transcript at 371.
[47] Transcript at 382.
[48] Transcript at 383.

family.  Plaintiff stated that his hobbies include skateboarding, online gaming, bowling and attending baseball games.

However, Plaintiff's father told Ippolito that Plaintiff has difficulty completing tasks, difficulty staying on topic during conversations, problems understanding social cues, and difficulty adjusting to changes in routine.  Plaintiff's father further stated that Plaintiff is easily distracted and has difficulty with time management and with completing school assignments.

Nevertheless, based on Plaintiff's "presentation during the evaluation and responses," Ippolito concluded that he "appears to have some mild deficits with regard to social skills and self-direction."[49]

Following her examination of Plaintiff, Ippolito noted that Plaintiff had fluent speech, coherent and goal-directed thought processes, anxious affect, neutral mood, intact attention and concentration, intact memory, fair insight, fair judgment, and average intellectual functioning. Ippolito stated that IQ testing showed that Plaintiff's full scale IQ was "within the average range of ability," and that his verbal comprehension score was "within the high average range."[50]

Ippolito's diagnosis was "Autism spectrum disorder (Estimated level 1), by report."  Ippolito recommended that Plaintiff continue on his medications and pursue vocational training and rehabilitation.  Ippolito's prognosis was "fair to good, given his cognitive abilities and reported stabilization with current medication."[51]  Ippolito's

_____

[49] Transcript at 373.
[50] Transcript at 372.
[51] Transcript at 386.

medical source statement was as follows:

> The claimant presents as able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, and make appropriate decisions with no evidence of limitations. He can relate adequate[ly] with other[s] and appropriately deal with stress with moderate limitations. These limitations are due to his suspected developmental delay and social skills deficits. The results of the present evaluation appear to be consistent with psychiatric problems, but in itself this does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis.[52]

Ippolito also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)," in which she stated that Plaintiff has no limitations on his ability to "understand, remember, and carry out instructions."[53] Ippolito stated, however, that Plaintiff has moderate limitations with regard to interacting appropriately with the public, supervisors and co-workers, and with regard to responding changes in a routine work setting. With regard to such moderate limitations, Ippolito stated, "He appears to have some social skills deficits that may interfere with social communication."[54]

On March 17, 2016, Samuel Balderman, M.D. ("Balderman") performed at consultative internal medicine examination at the Commissioner's request, and concluded that Plaintiff "has no physical limitations."[55]

On February 18, 2016, and August 18, 2016, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). Plaintiff was accompanied by his

---

[52] Transcript at 385.
[53] Transcript at 362.
[54] Transcript at 363.
[55] Transcript at 368.

attorney.   Plaintiff stated that when his medications wear off, he finds it "extremely hard to concentrate." Plaintiff stated that he needs reminders to take care of his hygiene. Plaintiff stated that he socializes with family and with a small group of friends on a daily basis.   Plaintiff stated that he can have problems performing tasks if he becomes distracted.   Plaintiff stated that he likes to have advance notice before changes take place, and that he once became quite distressed at school when school officials changed the location of his locker.   Plaintiff stated that his parents provide him with a structured schedule for performing hygiene and completing tasks each day.   Plaintiff indicated that he has completed his high school degree online.   Plaintiff testified that he would like to attend college, but that he was presently spending most days reading or playing online games with his friends.   Plaintiff stated that he has not gotten his driver's license because he is not sure that he can handle driving, and that he does not like public transportation because he feels uncomfortable around strangers.   Plaintiff stated that he might have difficulty dealing with other people in a work setting, since because of his disabilities, he finds it difficult to trust people enough to talk with them.   Plaintiff stated that he did not feel he could ever work a regular job eight hours per day, because he "can't keep focus long enough."[56]   When his attorney asked him to elaborate on that point, Plaintiff responded that he gets distracted by "every noise" and by "other things happening" to him.[57]

---

[56] Transcript at 42.
[57] Transcript at 42.

On September 29, 2016, the ALJ issued his decision, denying Plaintiff's claim. Applying the familiar five-step sequential analysis used to evaluate disability claims,[58] the ALJ found at the first three steps, respectively, that Plaintiff had not engaged in substantial gainful employment since October 9, 2013, the date of the application; that Plaintiff has the severe impairment of autism spectrum disorder; and that such impairment does not meet or medically equal the severity of a listed impairment.

Prior to reaching the fourth step of the sequential analysis, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform medium work, with the following limitations:

> He is able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, perform complex tasks independently, and make appropriate decisions. He has moderate limitations (defined as more than a slight limitation but still able to function satisfactorily) in relating adequately with others and in appropriately dealing with stress. The claimant is further limited to occasional interaction with the public, coworkers and supervisors.

In arriving at this RFC determination, the ALJ reviewed and summarized Plaintiff's alleged symptoms, and noted that they were "not entirely consistent with the medical evidence and other evidence."[59] In general, the ALJ observed that, "[t]he medical evidence shows rather mild to moderate clinical abnormalities and that the claimant's autism spectrum is within the lower level of severity, such that he could perform at the residual functional capacity stated in this decision."[60]

---

[58] *See, Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (Explaining the five-step sequential analysis).
[59] Transcript at 25.
[60] Transcript at 25.

With regard to the specific evidence, the ALJ began by summarizing Dr. Magyar's consultative findings, but then noted that Plaintiff "showed improvement as he got older." On this point, the ALJ referred to Dr. Martin's office notes, which typically contained unremarkable findings and made repeated refences to progress and improvement.

The ALJ also discussed Dr. Ippolito's findings, which he gave "significant weight."[61] In that regard, the ALJ noted that Ippolito's opinion was not contradicted by the opinion of any treating physician, and, to the contrary, that it was consistent with Dr. Martin's findings. The ALJ also noted that Plaintiff had stopped seeing Dr. Martin for therapy approximately one and a half years prior to the hearing.

The ALJ further found that while it appears that Plaintiff needs reminders for certain things and has difficulty with social interaction, he is nevertheless able to do a wide variety of activities. The ALJ noted, for example, that Plaintiff played sports and had hobbies, that he socialized with family and friends, and that he completed his online high school courses, "with grades in the 90's."[62] The ALJ added: "The undersigned notes that during the hearing, the claimant answered all questions intelligently, thoughtfully and cogently and that he generally appeared as an intelligent and pleasant young man."

The ALJ further noted that he had considered the statement from Mr. Ramsey, detailing "the purported problems and issues the claimant has," but determined that the "overall record, including the medical evidence, does not support that the claimant has

---

[61] Transcript at 27.
[62] Transcript at 26.

such severe Asperger's disorder or autism spectrum disorder that would prevent him from engaging in some type of employment."[63]

At the fourth step of the sequential analysis, the ALJ found that Plaintiff has no past relevant work.   And finally, at the fifth step, the ALJ found, based upon testimony by a vocational expert ("VE") given in response to hypothetical questions at the hearing, that Plaintiff can perform various jobs, including "laundry laborer," DOT 361.687-018, "industrial cleaner," DOT 381.687-018, and "garment marker," DOT 369.687-026. Accordingly, the ALJ found that Plaintiff was not disabled at any time between the date of the application and the date of his decision.

Plaintiff appealed, but on December 8, 2017, the Appeals Council declined to review the ALJ's determination.

On February 7, 2018, Plaintiff commenced this action, and on September 19, 2018, he filed the subject motion [#9] for judgment on the pleadings.   Plaintiff contends that remand is required because the ALJ erred in four respects: 1) he failed to account for Plaintiff's stress-related limitations when making his RFC finding; 2) he failed to weigh the opinion of Dr. Magyar; 3) he did not support his credibility findings with substantial evidence; and 4) he committed "plain error" by failing to account for the evidence submitted by Plaintiff's parents.

On November 15, 2018, Defendant filed the subject cross-motion [#12] for judgment on the pleadings.

---

[63] Transcript at 28.

The Court has reviewed the entire record and the parties' submissions.

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered. *Id.*

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted). In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) (" Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it.").

<u>The ALJ Considered Plaintiff's Stress-Related Limitations</u>

Plaintiff contends that the ALJ failed to consider his alleged inability to handle stress, when making the RFC determination. On this point, Plaintiff admits that in the

18

ALJ's decision, he found that Plaintiff had moderate limitations "in appropriately dealing with stress."[64] Nevertheless, Plaintiff claims that the ALJ's RFC finding improperly failed to account for his "stress-related limitations and their impact on his ability to meet the basic mental demands of work."[65] In this regard, Plaintiff asserts that the ALJ "did not inquire with sufficient specificity about the nature of" his stress, and "only made two fleeting references" to such stress.[66] Plaintiff maintains that this was erroneous, since "[t]he overwhelming evidence in the record indicates that [he] has serious difficulty handless stressful situations."[67] For example, Plaintiff refers to his testimony at the hearing, where he described a situation years earlier in which he had become upset, due to being reassigned a locker in a different part of the school, and needed to call his parents. Plaintiff insists that his inability to handle stress would cause him to be "off task for about 30 to 45 minutes at least twice a day," which would make him unemployable.[68]

However, the Court does not agree that the ALJ failed to properly account for Plaintiff's alleged stress when making his RFC determination. As already mentioned, the ALJ noted that Dr. Ippolito's report stated that Plaintiff would have only moderate limitations in appropriately dealing with stress, and the ALJ gave that opinion great weight. That determination is supported by substantial evidence.[69] Further, the ALJ

---

[64] Pl. Memo of Law [#9-1] at p. 16.
[65] Pl. Memo of Law [#9-1] at p. 17.
[66] Pl. Memo of Law [#9-1] at p. 18.
[67] Pl. Memo of Law [#9-1] at p. 18.
[68] Pl. Memo of Law [#9-1] at p. 19.
[69] Plaintiff maintains that Ippolito's opinion is inconsistent with the rest of the record, but the Court disagrees.

expressly incorporated that limitation into the RFC.[70]   Moreover, the VE testified that a claimant with moderate limitations in dealing with stress would still be able to perform the jobs identified in the ALJ's decision.[71]   Accordingly, Plaintiff's argument on this point lacks merit.

<u>The ALJ Was Not Required to Assign Particular Weight to Magyar's Opinion</u>

Plaintiff next contends that reversal is required because the ALJ "implicitly rejected Dr. Magyar's opinion without applying the mandated regulatory factors or otherwise enabling the Court to determine how the ALJ weighed her opinion."[72]   As support for this argument, Plaintiff cites regulatory language requiring the Commissioner to "evaluate every medical opinion" received.   Plaintiff contends that the ALJ must have rejected Magyar's opinion, since he did not incorporate the "limitations and accommodations" identified in her repot into the RFC finding.   Plaintiff also contends that the ALJ should have given significant weight to Magyar's opinion, since it was "consistent with the testimony of the Plaintiff and his parents that he required constant assistance and supervision in order to carry out most of his daily activities."[73] However, the Court does not agree with this argument.

Preliminarily, Plaintiff's contention, that both Plaintiff and his parents consistently indicated that he needs "constant assistance and supervision" to carry out most daily activities, is not entirely accurate.   Clearly, that is what the parents contend.   However,

---

[70] Transcript at 24.
[71] Transcript at 49.
[72] Pl. Memo of Law [#9-1] at p. 21.
[73] Pl. Memo of Law [#9-1] at p. 22.

Plaintiff's statements suggest that he is more independent than his parents maintain.[74]

Further, it is no surprise that Magyar's opinion is consistent with the statements of

Plaintiff's parents, since it was the parents who provided most of the information upon

which Magyar's opinion was based.[75]

In any event, the Court does not agree that the ALJ implicitly rejected Magyar's

opinion. Notably, Magyar's opinion was rendered when Plaintiff was fifteen years of

age, almost four years prior to the alleged disability onset date. The ALJ discussed

Magyar's opinion, and gave no indication that he believed it was not an accurate

assessment of Plaintiff's condition at the time it was written. However, immediately

after discussing Magyar's opinion, the ALJ stated that, "[t]he claimant has showed

improvement as he got older." The ALJ went on to discuss the evidence of record

supporting the assertion that Plaintiff's condition had improved, such as Dr. Martin's

office notes and Dr. Ippolito's evaluation. The ALJ also noted that just a few months

before Plaintiff filed his application for benefits, he stopped treating with Dr. Martin

because he and his parents felt that his condition had stabilized to the point that therapy

was no longer necessary.[76] Such fact seems to show clear improvement in Plaintiff's

---

[74] As an aside, it is difficult to understand how, at age fourteen, Plaintiff could ever have been sent to an out-of-state boarding school, if he requires the level of parental oversight that Plaintiff's parents are contending he needs just to maintain basic hygiene. The record contains no suggestion that Plaintiff received that same level of supervision at the boarding school.
[75] The most severe findings in Magyar's report were the results of the Vineland Adaptive Behavior test and the Child Behavior Checklist, both of which were based entirely on information provided by Plaintiff's parents. There is no indication that Magyar questioned anything that Plaintiff's parents told her. The Court is not implying that this was improper, even though Plaintiff was fifteen years of age at the time. The Court is only pointing out that Magyar's report largely restates information related by Plaintiff's parents.
[76] See, Transcript at p. 228 (Dr. Martin's last office note, dated June 28, 2013) and Transcript at p. 355 (Dr. Wisnoski's intake note: "Parents and pt feel he is very stable on current regimen. No longer seeing therapist.").

21

condition between the date of Magyar's report and the alleged disability onset date, since one of Magyar's express recommendations had been that Plaintiff continue receiving treatment from Dr. Martin.[77]   Accordingly, the Court does not agree that the ALJ rejected Magyar's opinion.   Rather, it appears that the ALJ did not find Magyar's report particularly relevant to a determination of Plaintiff's condition during the period of alleged disability, given the evidence that Plaintiff's condition had improved since the date of Magyar's report.[78]   Accordingly, the Court finds that Plaintiff's argument on this point lacks merit.

### The ALJ Did Not Mischaracterize the Record

Plaintiff next asserts that the ALJ's credibility determination was faulty because it was based on a mis-characterization of the record.   In particular, Plaintiff contends that the ALJ improperly interpreted evidence of Plaintiff's daily activities as showing that he is more capable than he really is.   In this regard, Plaintiff asserts that "the ALJ ignored the testimony of Plaintiff and third-party statements from his parents, suggesting that he need[s] constant assistance to perform many of his daily living activities."[79]   On this point, Plaintiff refers to statements from his parents, which indicate that he "requires constant supervision."[80]   For example, and as already discussed, the parents contend that Plaintiff is not even able to use the toilet or take a shower properly without their assistance.   Relying upon such evidence, Plaintiff argues that, "[d]ue to the ALJ's

---

[77]  Transcript at 334 ("Alex should continue to be followed by Dr. Martin for psychiatric services.").
[78]  Plaintiff suggests that the ALJ "automatically rejected" Magyar's opinion because it "pre-dates the alleged disability onset date." Pl. Memo of Law [#9-1] at p. 23.   However, the Court sees no evidence of that.
[79]  Pl. Memo of Law [#9-1] at p. 24.
[80]  Pl. Memo of Law [#9-1] at p. 25.

mischaracterization of the evidence in the record, the ALJ's credibility finding was not supported by substantial evidence, warranting remand."[81]   However, the Court again disagrees.

At the outset, the Court has reviewed the entire record, and finds that Plaintiff's contention, that the ALJ mis-characterized the record, is not accurate.   To the contrary, the Court finds that the ALJ accurately summarized the evidence, without regard to whether it weighed for or against a finding of disability.   In this regard the ALJ clearly did not "ignore" the evidence to Plaintiff refers.   Rather, the ALJ acknowledged such evidence, but found that it was outweighed by other evidence.   For example, the ALJ discussed the evidence form Plaintiff's father, but noted that "the overall record, including the medical evidence," did not support a finding of disability.[82] "As a fact-finder, an ALJ is free to accept or reject the testimony of a parent." *Gallo v. Colvin*, No. 13-CV-06528 MAT, 2014 WL 3901129, at *6 (W.D.N.Y. Aug. 11, 2014) (citation omitted).

The ALJ's findings concerning Plaintiff's ability to perform activities of daily living are supported by substantial evidence, such as Dr. Ippolito's report, which found that Plaintiff had only "mild deficits with regard to social skills and self-direction."[83] Significantly, Ippolito made this finding even though Plaintiff's father, who was present during the examination, related to her much of the same information contained in his

---

[81] Pl. Memo of Law [#9-1] at p. 24.   Plaintiff's reply memo of law contends that the ALJ "grossly exaggerated the nature of Plaintiff's activities of daily living" and "grossly mischaracterized Plaintiff's activities of daily living and then relied on those limited activities to find Plaintiff was not as limited as alleged."
[82] Transcript at 28.
[83] Transcript at 385.

submission to the ALJ.[84]   Moreover, as the ALJ noted, the evidence to which Plaintiff refers is not entirely consistent.   For instance, Plaintiff has alternately indicated both that he cares for his personal needs, such as showering and dressing, without assistance from his parents,[85] and that he needs reminders form his parents to perform even basic hygiene.[86]   In sum, Plaintiff's contention, that the reversal is required because the ALJ mis-characterized the record, lacks merit.

<u>The ALJ Considered the Statements from Plaintiff's Parents</u>

Plaintiff's final contention is that reversal is required because the ALJ "failed to account" for the evidence from Plaintiff's parents, which, if believed, establishes that he is unable to work.[87]   In particular, Plaintiff contends that the ALJ "improperly failed to acknowledge the statements of Plaintiff's mother in her function report," and "failed to specifically account for Plaintiff's father's statement in his character statement."[88] Plaintiff maintains that the ALJ erred by failing to make "specific findings" concerning such evidence, which deprives a reviewing court of the "opportunity for intelligible plenary review of the record."[89]   However, the Court again disagrees.

Even assuming that the ALJ had erred in failing to make specific findings concerning the statements by Plaintiff's parents, such fact would not affect this Court's ability to make a plenary review of the record, contrary to what Plaintiff suggests.   The

---

[84]  See, Transcript at 370, 383.
[85]  *See, e.g.*, Transcript at 372, Ippolito Report ("The claimant reports that he is able to do basic cooking and showering and dressing independently."); *see also, id.* at 366, Balderman report ("The claimant can bathe and dress himself.").
[86]  Transcript at 64, 60 (Plaintiff testified that he needs reminders to perform even basic hygiene) .
[87]  Pl. Memo of Law [#9-1] at p. 27.
[88]  Pl. Memo of Law [#9-1] at p. 27.
[89]  Pl. Memo of Law [#9-1] at p. 27.

entire record is before the Court, and the court conducts a plenary review of the record to determine whether the ALJ's decision is supported by substantial evidence. *See, Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019) ("We conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.").

More importantly, an ALJ is not required to discuss every piece of evidence. Here, the ALJ specifically stated that he gave careful consideration to "all the evidence,"[90] and there is no reason to believe that he did not do so. Moreover, as already mentioned, the ALJ discussed the statement from Plaintiff's father, accurately describing it as a "detailed recording of the purported problems and issues the claimant has." It is evident from the ALJ's decision that he was well aware that such statement indicated that Plaintiff requires constant supervision. The ALJ found, however, that such statement was not consistent with the "overall record, including the medical evidence." The Court has already indicated that such finding is supported by substantial evidence. Plaintiff is essentially asking the Court to re-weigh the evidence, which the Court is not permitted to do. To the extent that Plaintiff complains that the ALJ did not expressly discuss the statement from his mother, such fact is harmless in any event, since the information contained therein is merely cumulative of the information contained in the far-more-detailed statement from Plaintiff's father.[91]

---

[90] Transcript at 20.
[91] Also, while the latter statement is signed only by Plaintiff's father, it purports to relate information from both parents. Transcript at 213-220.

25

CONCLUSION

For the reasons discussed above, Plaintiff's motion [#9] is denied, and

Defendant's motion [#12] is granted.   The Clerk is directed to enter judgment for

Defendant and close this action.

So Ordered.

Dated:       Rochester, New York
             October 4, 2019              ENTER:


                                          /s/ Charles J. Siragusa
                                          CHARLES J. SIRAGUSA
                                          United States District Judge